DA 09-0133

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 6

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JOHN BRANDON LACEY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 99-76B
Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Joslyn Hunt, Chief Appellate Defender; Tammy A. Hinderman, Assistant
Appellate Defender; Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General; Tammy K Plubell,
Assistant Attorney General; Helena, Montana

            Marty Lambert, Gallatin County Attorney; Ashley Harrington, Deputy
County Attorney; Bozeman, Montana

Submitted on Briefs:  November 18, 2009

Decided:  January 19, 2010

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Appellant John Brandon Lacey (Lacey) appeals from the sentence imposed by the Eighteenth Judicial District Court, Gallatin County, for his conviction on two counts of Sexual Intercourse Without Consent in violation of § 45-5-503, MCA.

¶2 We consider the following issues on appeal:

¶3 *I. Whether the District Court erred by denying Lacey's motion to dismiss for a violation of his constitutional right to a speedy trial.*

¶4 *II. Whether the District Court erred by denying Lacey's motion in limine and allowing the State to present evidence that Lacey provided intoxicating substances and made sexual advances to young men other than the named victim.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 This case arises out of Lacey's alleged sexual intercourse without consent with J.G. While the facts are generally not in dispute, we review those facts that are relevant to the issues presented on appeal. During the spring of 1997, Lacey moved from Bozeman, Montana to Southern California where he lived with his aunt and cousin for approximately three months. Unable to find work, Lacey moved to Texas where his mother and family ranch were located. In August 1997, Lacey briefly returned to Bozeman, collected his belongings and returned to Texas. While in Texas, Lacey received letters from his son and daughter in Bozeman indicating that there were rumors and allegations that Lacey had engaged in "inappropriate [sexual] behavior" with several of his former Bozeman employees. Lacey responded to these allegations in a letter to his

2

daughter indicating that the rumors were untrue and that he had not been involved in any inappropriate behavior. He also indicated that he believed he was dying of cancer and that he was going to Mexico to seek treatment. Nevertheless, in November 1997, some six months after Lacey left Montana, the Gallatin County Sheriff's Office began investigating allegations that Lacey had sexually abused one or more young men whom he had befriended and employed.

¶6 In February 1998, the Gallatin County Sheriff's Office submitted its investigation to Deputy Gallatin County Attorney Jane Mersen (Mersen) for prosecution. As Lacey was not in Gallatin County at the time, a detective was employed to locate him. On February 10, 1998, law enforcement requested assistance from the Rocky Mountain Information Network (RMIN) in locating Lacey. RMIN searched for criminal history, civil filings, driver's license inquiries, recent addresses and utility records in Lacey's name. Despite this extensive search, the only information RMIN found was that Lacey owned property in Alice, Texas which was subject to a federal tax lien. A trace based on credit also revealed two post office boxes for Lacey in Alice, Texas. On April 7, 1999, having failed to locate him for questioning, Gallatin County charged Lacey by Information with two counts of sexual intercourse without consent. The Information alleged Lacey knowingly had sexual intercourse without the consent of J.G., a male over the age of sixteen. The county attorney obtained a warrant and extradition request indicating that, if another jurisdiction arrested Lacey, the State of Montana would extradite him. The warrant and extradition request were input onto the National Criminal

3

Information Center (NCIC) database. On April 9, 1999, Mersen also met with Lacey's daughter and ex-wife who both informed Mersen that they believed Lacey was in Mexico. This information was relayed on to the Gallatin County Sheriff's Office to aid in their search for Lacey. Despite this information, neither the detective working on the case nor the Gallatin County Sheriff's Office attempted to contact United States Border Patrol. While these events were unfolding in Montana, Lacey had been on the move.

¶7 After spending time in Texas, Lacey moved to California and then Mexico where he allegedly saw a doctor regarding what he believed to be testicular cancer. After working for several months on sailing boats in Mexico, Lacey found employment sailing back up the Baja Peninsula to San Diego, California. Over the next four years, Lacey moved back and forth between Catalina, California and Mexico, working on sailing and fishing boats and as a caretaker for various properties. During this time Lacey was paid in cash and did not own or rent property in his name. He also crossed the U.S./Mexico border multiple times using his Montana driver's license for identification purposes. In February 2003, Lacey purchased a vehicle in Arizona and moved to Las Vegas, Nevada where he obtained a job selling outdoor barbecues and kitchens.

¶8 In 2005 the Gallatin County Sheriff's Office received information that Lacey had obtained a car salesman's license in Nevada but that he had been fired from the dealership where he worked. Nevada law enforcement attempted to locate and serve Lacey with the Montana warrant but was unable to locate him. In fact Lacey, who had started a hot sauce company registered in his name with the State of Nevada, had moved

4

to Arizona where the hot sauce bottler was located. On November 8, 2007, Lacey was arrested in Flagstaff, Arizona after he was "picked up" on the NCIC database.

¶9 After his arrest in Arizona, Lacey was returned to Montana and made his initial appearance on December 3, 2007. After the omnibus hearing was continued six times at Lacey's request, it was finally held and trial was scheduled for October 7, 2008. The Omnibus Hearing Order indicated that, pursuant to M. R. Evid. 404(b) and § 46-13-109, MCA, the State did not intend to introduce evidence of other crimes, wrongs or acts and that Lacey intended to file a motion in limine. The District Court ordered that the motion "shall be filed on or before June 13, 2008." On June 13, 2008, Lacey filed a motion to dismiss arguing that the State of Montana failed to "provide [him] with a speedy trial guaranteed by the Montana and Federal Constitutions." In its order denying Lacey's motion to dismiss, the District Court addressed the balancing test this Court laid out in *State v. Ariegwe*, 2007 MT 204, 338 Mont. 442, 167 P.3d 815, and concluded that:

> In light of the evidence indicating that the Defendant deliberately avoided being brought to trial in this matter, the authority cited herein requires the Court to attribute the majority of pretrial delay to the Defendant. Consequently . . . the Defendant's speedy trial challenge is without merit.

On October 1, 2008, Lacey also filed a motion in limine to exclude evidence of "other bad acts" including evidence showing he provided intoxicating substances to and made sexual advances on young men other than J.G. During the pretrial conference, the District Court denied the motions reasoning that, having been filed after the June 13, 2008 deadline, they were untimely. The District Court also adopted the State's argument

5

on the merits, concluding that the evidence was admissible pursuant to the transaction rule.

¶10 Ultimately, the jury returned a verdict of guilty on both counts of sexual intercourse without consent and Lacey was sentenced to 20 years in Montana State Prison with 10 years suspended to be served consecutively for each count. Lacey appeals.

## STANDARD OF REVIEW

¶11 In order to address a speedy trial claim a district court must first make findings of fact. *Ariegwe*, ¶ 119. This Court reviews those factual findings to determine whether they are clearly erroneous. *Ariegwe*, ¶ 119. A district court's factual findings are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. *Ariegwe*, ¶ 119; *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, 53 P.3d 870. While the factual findings are reviewed under the clearly erroneous standard, whether those facts amount to a violation of the defendant's right to a speedy trial is a question of constitutional law. *Ariegwe*, ¶ 119. We review a district court's conclusions of law de novo to determine whether the court's interpretation and application of the law are correct. *Ariegwe*, ¶ 119.

¶12 A district court's decision to grant or deny a motion in limine is reviewed for an abuse of discretion. *State v. Ayers*, 2003 MT 114, ¶ 23, 315 Mont. 395, 68 P.3d 768. In exercising its discretion, however, the trial court must abide by the Rules of Evidence or applicable statutes. As such, to the extent a district court's ruling is based on an

interpretation of an evidentiary rule or statute, our review is de novo. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811.

## DISCUSSION

¶13 *I. Whether the District Court erred by denying Lacey's motion to dismiss for a violation of his constitutional right to a speedy trial?*

¶14 It hardly bears repeating that "[a] criminal defendant's right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article II, Section 24 of the Montana Constitution." *Ariegwe,* ¶ 20. When confronted with a speedy trial claim, we consider the following four factors to determine if the defendant's constitutional right has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's responses to the delay; and (4) the prejudice caused by delay to the accused. *See State v. Billman*, 2008 MT 326, ¶ 11, 346 Mont. 118, 194 P.3d 58 (summarizing the speedy trial test laid out in *Ariegwe*).[1] Under this test, no single factor is indispensible or dispositive. "Rather, the factors must be considered together with such other circumstances as may be relevant." *Ariegwe*, ¶ 102.

¶15 As the length of delay (3,472 days) is not in dispute, we first turn our attention to the second prong of the four-factor test—the reasons for the delay. Under this factor, the court identifies each period of delay in bringing the accused to trial and attributes each

---

[1] In *Doggett v. U.S.*, 505 U.S. 647, 112 S. Ct. 2686 (1992), the United States Supreme Court spelled out a similar four-factor speedy trial test. However, in resolving the case before us here, while we refer to federal court precedent, our decision today is based on the right to a speedy trial grounded in the Montana Constitution.

period of delay to the appropriate party. *Ariegwe*, ¶¶ 63-64. Here, while there are several distinct periods of delay, the primary area of contention is the 3,137-day delay between the issuance of the warrant and Lacey's arrest. Accordingly, we focus our analysis on that period.

¶16 The District Court concluded that during the 3,137-day delay Lacey "was aware that he had been accused of wrongdoing in Montana and was actively seeking to avoid apprehension by law enforcement authorities." The District Court thus attributed the 3,137-day delay to Lacey. On appeal, Lacey contends that the District Court erred in finding that he was aware of the charges against him. He maintains that the "evidence relied on by the court in finding that [he] knew of the charges . . . falls short of the mark" and that the District Court's conclusion that he absconded was in error. In the alternative, Lacey posits that even if the District Court properly found that he absconded, the court erred by failing to address the State's role in the 3,137-day delay. While we agree with Lacey that the District Court erred by failing to account for the State's actions under factor two, we conclude that the delay was, nevertheless, properly attributed to Lacey.

¶17 "'[T]he primary burden' to assure that cases are brought to trial is 'on the courts and the prosecutors.'" *Ariegwe*, ¶ 72 (quoting *Barker v. Wingo*, 407 U.S. 514, 529, 92 S. Ct. 2182, 2191 (1972)). "A defendant has no duty to bring himself to trial; the State has that duty." *Barker*, 407 U.S. at 527, 92 S. Ct. at 2190. Thus, the prosecution has the burden of explaining pretrial delays. *Ariegwe*, ¶¶ 64-65. We have held that "negligence (or lack of diligence) in bringing the accused to trial [is] an unacceptable reason for

8

delay." *Ariegwe*, ¶ 69.  Accordingly, if an accused is outside of Montana's jurisdiction, "the State must act diligently and in good faith to acquire jurisdiction."  *State v. Longhorn*, 2002 MT 135, ¶ 22, 310 Mont. 172, 49 P.3d 48, *overruled on other grounds*, *Giambra v. Kelsey*, 2007 MT 158, ¶ 27, 338 Mont. 19, 162 P.3d 134.

¶18   On the other hand, if the defendant avoids being brought to trial, some or all responsibility for the delay should be attributed to him.  Under factor two, the defendant and the State can both be attributed with, and share responsibility for, the same period of delay.  *See e.g. State v. Morrisey*, 2009 MT 201, ¶ 66, 351 Mont. 144, 214 P.3d 708 (attributing responsibility for the delay equally between the defendant and the State).  In short, the proper analysis under factor two requires addressing not only the reasons for the delay as they pertain to the defendant's actions but also whether the delay can be attributed to the State for failing to act diligently and in good faith to acquire jurisdiction.

¶19   Here, the District Court only addressed one side of the equation.  While we agree that Lacey's actions—including absence from his mother's funeral, failure to contest legal actions against his family's real property, failure to file state and federal income tax returns and moving to Mexico—all support the District Court's conclusion that Lacey intentionally avoided being brought to trial, the State could have been more diligent.  The record indicates that the County Attorney sought and received a warrant for Lacey's arrest and that this warrant was entered into the NCIC database.  It further indicates that the Montana authorities regularly re-validated this warrant and employed RMIN to search for Lacey.  The evidence however, also demonstrates that the Gallatin County Sheriff's

9

Office knew that Lacey was likely moving back and forth between California and Mexico. Despite this knowledge, there is nothing in the record indicating that either the Bozeman Police or the Gallatin County Sheriff's Office attempted, in response to this evidence, to contact California authorities or United States Border Patrol. While we are cognizant of the fact that, as Detective McLane testified, "Gallatin County alone has several thousand warrants outstanding as we sit here right now," the State should have, at the very least, contacted United States Border Patrol when the evidence clearly suggested that the accused was likely crossing the U.S./Mexico border on a regular basis. Nevertheless, despite the District Court's failure to address the State's diligence or lack thereof, we are satisfied that on balance, the evidence supports the District Court's ultimate conclusion that the reason for the delay should be attributed to Lacey. It is undisputed that Lacey knew there were rumors and allegations of his misconduct in Bozeman and, when taken as whole, this knowledge coupled with his actions over the course of those 3,137 days supports the conclusion that the delay was properly attributed to Lacey. That conclusion however, does not end the inquiry. We have emphasized that despite concluding that the reason for the delay should be attributed to the defendant, the "'courts must still engage in a difficult and sensitive balancing process'" and "'this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.'" *Ariegwe*, ¶ 101 (quoting *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193). We thus turn our attention to the third factor in our speedy trial analysis—the accused's responses to the delay.

10

¶20 In *Ariegwe* we explained that the court must evaluate the accused's responses to the delay and that "the totality of the accused's various responses to the delays in bringing him or her to trial . . . is indicative of whether he or she actually wanted a speedy trial, which in turn informs the inquiry into whether there has been a deprivation of the right." *Ariegwe*, ¶ 110. Put differently, this factor requires an examination of the accused's responses to the delay and a determination of whether those responses are consistent with a desire to have a speedy trial. If the accused's responses indicate that he or she did not desire a speedy trial, this factor weighs against finding a violation of the right and "serves as a gauge of the weights the court should assign to the other three factors in the balancing." *Ariegwe*, ¶ 110.

¶21 Under this factor the District Court concluded that "[t]he Court need not consider the accused's response to the delay where the accused himself is responsible for creating the delay." Lacey contends that since he filed his motion to dismiss "only 220 days after he learned of the charges against him . . . [t]his factor . . . should weigh in [his] favor." The State on the other hand argues that, while the District Court's "analysis of factor three was not as artfully crafted as what *Ariegwe* anticipated," the court properly concluded that Lacey "did not evidence a sincere desire to defend against the charges and go to trial."

¶22 At the outset, we note that the District Court's conclusion that it need not consider Lacey's responses to the delay because it concluded that Lacey was responsible for creating the delay misinterprets the balancing test laid out in *Ariegwe*. With regard to

11

factor three, we have concluded that the court must evaluate "the totality of the accused's various responses to the delays in bringing him or her to trial . . . together with the other three factors of the balancing test." *Ariegwe*, ¶ 79. The District Court erred to the extent that it failed to specifically address Lacey's "acquiescence in and objections to pretrial delays." *Ariegwe*, ¶ 79. This error is not grounds for reversal, however, because under the totality of Lacey's responses to the delays, we conclude that the balance tips against finding a deprivation of his constitutional right to a speedy trial. While Lacey's motion to dismiss was timely for the purposes of factor three analysis, his other responses, as discussed above, indicate that he did not actually want a speedy trial. Thus, we conclude that the totality of Lacey's responses to the delay supports weighing the other three factors against him.

¶23 Factor four requires an inquiry into whether the accused has been prejudiced by the delay. *Ariegwe*, ¶ 86. In making this inquiry, courts must address the interests that the speedy trial right is designed to protect—namely, (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern caused by the presence of unresolved criminal charges; and (3) limiting the possibility that the accused's ability to present an effective defense will be impaired. *Ariegwe*, ¶ 111. However, it is well-established that under certain circumstances, where the length of delay is great, the accused's burden of presenting affirmative evidence of prejudice is lessened. *See State v. Hardaway*, 2009 MT 249, ¶ 26, 351 Mont. 488, 213 P.3d 776.

12

¶24    In this instance, the District Court examined each of the interests the speedy trial right is designed to protect and concluded that Lacey's claims of prejudice fail because the delay was the result of Lacey's own actions.  On appeal, Lacey admits that he could show no direct prejudice to his defense, but contends that given the length of the delay and the State's negligence in causing it, prejudice should be presumed.  The State counters that "[s]ince Lacey himself admits there is no affirmative proof of prejudice, focusing on the other speedy trial factors in the instant case weighs in the State's favor rather than in Lacey's."

¶25    Under the totality of the circumstances in this case, we agree with the District Court that Lacey's claims of prejudice fail.  The primary reasons for the delay, other than the 182 days of institutional delay assigned to the State, were Lacey's actions including his constant movement, failure to file taxes or attend his mother's funeral, and the numerous other reasons discussed in our factor two analysis.  This, coupled with the fact that Lacey can show no evidence of direct prejudice to his defense, supports the conclusion that Lacey has failed to show prejudice under factor four of our speedy trial claim analysis.

¶26    While the right to a speedy trial is necessarily relative and depends upon the circumstances of the specific case, *Ariegwe*, ¶ 104, we determine that here, the District Court properly denied Lacey's motion to dismiss for lack of a speedy trial.  On balance, the four factors weigh against finding a violation of the right to a speedy trial.  We therefore affirm the District Court's denial of Lacey's motion.

13

¶27    *II. Whether the District Court erred by denying Lacey's motion in limine and allowing the State to present evidence that Lacey provided intoxicating substances and made sexual advances to young men other than the named victim.*

¶28    At the final pretrial conference the District Court denied Lacey's motion in limine explaining that it failed for two reasons:  first, because it was untimely and second, because the evidence was admissible under the transaction rule.  On appeal, Lacey argues that the District Court erred by denying his motion in limine and in allowing the State to present evidence that Lacey provided intoxicating substances and made sexual advances on young men other than J.G.  Lacey maintains that his motion was timely and that evidence of his interactions with other young men was "not inextricably linked with the charged offenses" so as to be admissible under the transaction rule.  Lacey urges that the evidence that he allegedly engaged in "other bad acts" with other young men was highly prejudicial.  He contends that since the State cannot show that there is no reasonable possibility this evidence did not contribute to his convictions, those convictions must be reversed.  The State counters that the District Court properly denied Lacey's motion in limine and allowed evidence of his interactions with other young men to be presented. The State maintains that Lacey's motion was untimely and that, even assuming it was timely, the evidence presented was admissible pursuant to the transaction rule.

¶29    The crux of the parties' dispute with regard to the timeliness of Lacey's motion is whether the District Court's order requiring that all motions "shall be filed on or before June 13, 2008" renders Lacey's October 1, 2008 motion untimely.  The District Court

reasoned that since all of the information regarding the contested evidence was available to Lacey prior to the June 13, 2008 motions deadline, his October 1, 2008 motion was untimely. We disagree.

¶30 The June 9, 2008 Omnibus Hearing Order clearly indicates that pursuant to M. R. Evid. 404, and § 46-13-109, MCA, the State did not intend to introduce evidence of other crimes, wrongs, or acts as part of their case against Lacey. Despite the fact that Lacey may have suspected the State intended to call these young men as witnesses, it is axiomatic that until a party is aware certain testimony is going to be offered, that party cannot object to the introduction of that evidence. Indeed, as Lacey points out, the motion itself "was arguably superfluous" because "Lacey could have simply waited until the State began questioning the other two young men regarding those encounters and objected at that time." In light of the State's representation that it would not offer such evidence, it would be illogical and unfair to require that Lacey file a motion to exclude that evidence prior to it being offered. Therefore, the District Court's denial of Lacey's motion on timeliness grounds was error. We now turn to whether the motion was properly denied on substantive grounds.

¶31 Under M. R. Evid. 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Despite this prohibition we have held that where "'the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act or omission is evidence as part of the transaction.'" *State v.*

15

*Crosley*, 2009 MT 126, ¶ 48, 350 Mont. 223, 206 P.3d 932 (quoting § 26-1-103, MCA). Pursuant to the transaction rule, evidence of other acts that are inextricably or inseparably linked to the charged offense is admissible notwithstanding the rules regarding other crimes or bad acts evidence. *State v. Buck*, 2006 MT 81, ¶¶ 75-76, 331 Mont. 517, 134 P.3d 53.

¶32 Here, evidence that Lacey plied other young men with intoxicating substances and made sexual advances on them may be similar to the circumstances of his conduct with J.G., but it is not inextricably linked to the offense for which Lacey was charged. The issue in dispute in the instant case is whether Lacey had sexual intercourse with J.G. without his consent. Evidence that he may have made sexual advances on other young men at other times does not tend to prove the operative facts at issue in the charged offense. As Lacey argues on appeal, "the State could explain that J.G. was intoxicated and that J.G. felt manipulated by Lacey all it wanted; it did not need to present the testimony of other young men regarding their separate encounters with Lacey in order to complete the story . . . ." The State's proffered evidence went to facts and addressed encounters that were completely separate from the sexual encounters for which Lacey was charged. In other words, for the purposes of the transaction rule, evidence of Lacey's "other bad acts" was not inextricably linked to the charged offense. The District Court erred in denying Lacey's motion in limine and allowing evidence that he provided intoxicating substances to and made sexual advances on young men other than J.G.

16

¶33     Despite our conclusion that the District Court erred in allowing the State to present evidence of Lacey's interactions with other young men, it is well established that a "cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." *Derbyshire,* ¶ 43. Once the defendant establishes the evidence in question was erroneously admitted and has alleged prejudice demonstrating there is a reasonable possibility that the inadmissible evidence might have contributed to a conviction, it is incumbent on the State to prove the error was harmless. *State v. Van Kirk*, 2001 MT 184, ¶ 42, 306 Mont. 215, 32 P.3d 735. Here, Lacey has alleged that the evidence admitted in error prejudiced him by painting him as a "lecherous old man who was, at best, unfaithful to his lover, and at worst, a sexual predator." The State on the other hand has not even attempted to argue that the error was harmless. The State has failed to meet its burden and we hold that the District Court's error in admitting the "other bad acts" evidence was prejudicial and requires reversal.

¶34     Affirmed in part, reversed in part and remanded for a new trial in accordance with this decision.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JAMES C. NELSON

17

/S/ PATRICIA O. COTTER
/S/ JIM RICE

Chief Justice Mike McGrath, specially concurring.

¶35 Regarding the admission of other acts evidence, I join the opinion of the Court. The transaction rule cannot be stretched to provide a vehicle for admission of the acts with other individuals in this case.

¶36 However, had the prosecution provided proper notice pursuant to § 46-13-109, MCA, I would have voted to affirm.

/S/ MIKE McGRATH

18